Filed 8/4/25  P. v. Estes CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CHARLES LAMONT ESTES,<br><br>Defendant and Appellant. | F087952<br><br>(Super. Ct. No. CR-23-003681)<br><br>**OPINION** |

### THE COURT[*]

APPEAL from an order of the Superior Court of Stanislaus County.  Dawna F. Reeves, Judge.

Michele A. Douglass, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, R. Todd Marshall and Kelly E. LeBel, for Plaintiff and Respondent.

-ooOoo-

---

[*] Before Franson, Acting P. J., Snauffer, J., and Ellison, J.[†]

[†] Retired judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Charles Lamont Estes appeals from the trial court's order denying his petition to terminate his sex offender registration under Penal Code[1] section 290.5, subdivision (a). He argues the People failed to meet their burden of proving community safety would be significantly enhanced by requiring his continued registration and the trial court abused its discretion in impliedly concluding otherwise. As part of his claim, he argues the trial court abused its discretion by misapplying a statutory factor in a way that impermissibly shifted the burden of proof to him. We agree on this point, and we accordingly reverse the trial court's order denying his petition and remand for a rehearing.

## BACKGROUND

In October 2004, Estes entered guilty pleas to one count of oral copulation of a person under the age of 16 (§ 288a, subd. (b)(2)) and one count of unlawful sexual intercourse (§ 261.5, subd. (d)). He was sentenced to two years in prison in January 2005 and ordered to register for life as a sex offender because of the oral copulation conviction.

## I.     The crimes

The following facts are taken from the preliminary hearing transcript, at which only the victim, M., testified.

M. was a 15-year-old girl when she testified at the preliminary hearing on July 20, 2004. She was born in August 1988. She lived with her aunt, Jean. M. referred to Jean as her mother as Jean was the woman who raised her. Jean's daughter was T., and M. referred to T. as her sister. In the summer of 2003, T. and Estes were engaged to marry.

M. first met Estes in the summer of 2003. T. and Estes were living together, and T. had taken M. over to their house one day so M. could babysit Estes's young son. Estes had two sons from another woman: one was 2 or 3 years old and the other was 13 or 14. T. was also pregnant at the time with Estes's child.

---

[1] Undesignated statutory references are to the Penal Code.

2.

M. went to Estes's home a second time, again to babysit. Estes and T. were going to be leaving early the next morning, so M. spent the night so that she could babysit the next day. She watched the children the next day and Estes and T. returned in the evening. There was no incident.

One day in the summer of 2003, M. was over at Estes's home with Estes and his two sons. T. was not there. Estes slapped M. on the butt as she was walking into the kitchen and he was walking out.

On another day, in July 2003,[2] M. was asleep at night in a bedroom at Estes's home. Estes and his two sons were there but T. was not. Estes came into her room, naked. He grabbed her hand, led her to his bedroom, and laid her down on the bed. He took off her pants and underwear and laid on top of her. He reached under her shirt and squeezed her breasts. He put his penis into her vagina and had intercourse with her until he ejaculated between her legs. He stayed in his bedroom, and she went back to her room and fell back asleep. She did not like what happened but did not tell him, and he also said nothing to her. She spent at least one more day at his home until T. took her back to Jean's home.

From this time until the end of January 2004, Estes and M. had sex more than five times but no more than 10 times. He also orally copulated her more than five times. Sometimes they had sex at his house and sometimes at Jean's while Jean was at work. Once, Estes asked M. if she liked it and M. said no, so he said he would stop, but he did not. Once while having sex, he said it felt good.

During the times at Estes's home when Estes's older son was there, Estes would tell him to go outside to play, and then Estes would have sex with M. As for the times at Jean's house, Estes knew Jean's work schedule, and he also would sometimes call M. to ask her if she was home alone. Sometimes M. would call him and ask him to bring her

_____

[2] M. would have been 14 this day.

money or food, and sometimes batteries, which he would do. Estes and M. did not always have sex when Estes came over to bring her things. After they had sex for the last time in January 2004, which was at Jean's house, Estes asked M. if she needed anything, and she said she did not. He asked if she was sure, and she said she was.

At some point, Estes told M. not to tell anyone they were having sex because he could go to jail for a long time. She did not want to tell Jean or T. because she "knew they'd be mad at [her]." She did not feel she could do anything to get Estes to stop having sex with her.

Estes never used a condom, and at the end of February 2004, M. told Estes she was pregnant. Estes bought a pregnancy test, which showed positive. He took her to Planned Parenthood, where they also administered a pregnancy test. Some weeks later, Estes took M. to another Planned Parenthood for an abortion. Estes was going to pay for the procedure, but since the facility would not accept a check as a form of payment, the abortion could not be performed that day. They went back to Planned Parenthood a third time. M. underwent a sonogram and blood test, and the physician said that specific facility could not perform M.'s abortion since she was too far along in her pregnancy— 16 weeks. The doctor advised M. to go to a facility in San Francisco, and Estes said he would take her.

When M. returned home after her third visit to Planned Parenthood, Jean noticed a band-aid on M.'s arm and asked what it was for. M. said she got scratched at school. Jean removed the band-aid, saw the needle mark, and asked M. who stuck her with a needle. M. answered it was Planned Parenthood.

M. told Jean that Estes had raped her, and police arrived several hours later. She also told the responding officer that Estes had raped her. However, M. testified that she lied to both Jean and the police that she was raped. She testified she was afraid to tell Jean and T. what was happening between her and Estes because she thought they would be mad at her. She explained this was "[b]ecause [she] kept this going. And [she] called

4.

[Estes] and [she] asked him to bring [her] stuff.  And [she] didn't tell them what happened when it first happened."  She feared they would think it was "all her fault."

In response to the prosecutor's questioning, M. clarified she thought rape was "[w]hen a person forces themselves on you," and Estes did not ever do that.  By "forces," she meant, "Like when you say no and stop and they do it anyway."  But she maintained that she did not want to have sex with Estes and she had told him no before.  Estes also apologized to her before for having sex with her, stating that he knew it was wrong.  He said he would stop, but he did not.  He also knew she was a virgin before the first incident.  M. testified Jean and T. were still mad at her.

## II.    Subsequent proceedings

### A.    Section 290.5 petition and opposition

On April 7, 2023, Estes petitioned the superior court under section 290.5 to terminate his sex offender registration.  Attached to his petition was a letter from the California Department of Justice stating that it had designated him as a tier one offender under the amended Sex Offender Registration Act (§§ 290 to 290.024), subject to registration for a minimum of 10 years following his conviction and release from incarceration.  Also attached was a "Proof of Current Registration" form from the Department of Justice.

On June 5, 2023, a section 290.5 "Petition Checklist" was filed by the Modesto Police Department.  The checklist showed Estes's date of conviction in January 2005[3] and his release from prison on February 1, 2006.  It also showed that, since his initial release from prison, he had spent an additional one year, 10 months, and four days in custody.[4]  The reason for and location of this incarceration was not stated.  This

---

[3] The precise date of conviction is illegible on the form, but the date was between January 20 and 29.

[4] This time in custody was listed under the section of the checklist asking:  "Total time petitioner spent in any period of subsequent incarceration, placement, or

additional time in custody resulted in his minimum 10-year registration period being tolled for that amount of time.  Thus, the checklist listed the "[m]inimum time period for the completion of [his] required registration period" as 11 years, 10 months, and 4 days. The checklist stated Estes was eligible to be relieved from his registration requirement.

The People filed an opposition to Estes's petition, asserting that "community safety would be significantly enhanced by [Estes's] continued registration."  (See § 290.5, subd. (a)(2).)  The People claimed that Estes, before committing the sex offenses, had suffered three battery convictions, a driving under the influence conviction, and a false imprisonment conviction, but they provided no evidence for these convictions, not even case numbers.  They also asserted without support that, after the sex offenses, Estes was convicted of embezzlement in 2006 and sentenced to two years in prison, and in 2007 he violated probation and was sent back to prison.

Attached to the People's opposition was a letter from M.  M. stated that shortly after the sexual abuse began, Estes stood next to her while she washed dishes, picked up a knife, and said, "If you tell anyone, I am going to kill you and them."  Jean blamed M. for what happened and kicked M. out of the house.  She had her abortion alone.  T. "tried to kill [her] after beating me multiple times."

M. expressed disappointment with Estes's sentence and felt the criminal justice system failed to take her case seriously.  She stated Estes was convicted only of "minor sex crimes related to [her] abuse."  She claimed Estes messaged her on Facebook in 2010, telling her he "thought [she] wanted it" and thought she "liked him" and "wanted to

---

commitment, including any subsequent civil commitment, except that arrests not resulting in conviction, adjudication, or revocation of probation or parole shall not toll the required registration period (include incarceration period(s) for failure-to-register conviction(s)) (PC § 290(e))."

6.

be with him." She asked him to never reach out to her again, and she thought it was illegal for him to contact her in the first place.[5]

M. stated she is reminded every day of what Estes did, and she said she no longer has connection with anyone in her family. She claimed her family still blames her for what happened and for T.'s son not having a father in his life. She claimed that her rheumatoid arthritis and other autoimmune diseases are the result of the trauma from the abuse.

M. said she believed what Estes did "should not be dismissed." She also believed Estes "will perpetrate again, if given the opportunity to." She said, "I also cannot, with a clear consci[ence], passively allow him to not register as a sex offender." She feared running into him or being contacted by him. She believed Estes could not be rehabilitated, and she feared for people "in his presence" who could not protect themselves.

The People, in their opposition, argued that nature and facts of Estes's sex offenses, which included a threat to kill M., and his criminal activity before and after those convictions, which included violence, "community safety would be significantly enhanced by [Estes's] continued registration" as a sex offender.

### B.    The first hearing

At the initial hearing on Estes's petition, the court began by telling Estes's counsel that it had questions for the defense. The court said it wanted to know whether Estes "ha[d] any of the board certified offender treatment, and if so, I would like to see proof of completion of that[.]" The court also said it wanted "information about what he's been doing since the time of his release from his two-year commitment." Third, the court said

---

[5] Despite thinking it was illegal for him to contact her, she did not state that she reported this to anyone.

it wanted "to know, since the complaining witness was a family member, what's the status of that relationship." The hearing was continued.

## C.  Subsequent filings

Estes submitted a four-page handwritten letter to the court and four letters of support. He began his letter by expressing "sincere remorse" to M. and her family. He called his actions "completely inexcusable and indefensible." He "truly regret[s]" the "irreparable harm" he caused M., M.'s family, and his family and children. He said that "[o]ver 20 years ago [he] took advantage of a young lady and committed this crime."

He said by going to prison he lost the only house he has ever purchased, career, and, "most importantly," "the connection to [his] family." Since his release from prison he has "stayed out of trouble." He has worked "menial jobs," experienced homelessness many times, "and endured all that comes along with being a 290 registrant." He's been assaulted, stabbed, purposely hit by cars, and verbally abused by people who knew his registration status. But he has never complained or retaliated, instead chalking up the hostile treatment "as a consequence of [his] past actions." His mental health has suffered, as he has been diagnosed with PTSD and has difficulty being around people and chooses to isolate himself. He is often distant with his partner. He had "in the recent past" volunteered at Department of Veterans Affairs facilities.

He wrote, "The arrogant, irresponsible young man who, more than 20 years ago committed this crime is no longer alive. I am now an almost 60-year-old man who has seen and lived the consequences of his actions and knows the harm he has caused to so many." He said having his petition granted would allow him to "regain some sense of dignity" and he would "not sway from the law abiding path" he has been on for over 20 years. He wants to be a father, grandfather, uncle, brother, and partner to all those he loves going forward without the burden of registration. He closed by saying he hopes and prays M. and all other persons he hurt have begun to heal.

Estes attached a "timeline" to his letter in which he explained his whereabouts from 2007 to the present. He said he was "released in 2007" and "followed all instructions."[6] He completed his three years of parole "with two incidents." One incident involved a failure to report his whereabouts to his parole officer which resulted in four months of reincarceration. As for the other incident, his parole officer violated him for using a library near a school and he spent another 32 days in jail, but the "review board" determine he had not violated any terms of parole and ordered him released. The rest of the timeline details where he has lived up to the present, the jobs he has worked, and other aspects of his life. He closed with: "I have not committed any new crimes and I have done nothing but comply with any and everything asked of me for over 20 years."

Estes received letters of support from a longtime friend, his son, another family member, and his partner. His son said Estes had been an "outstanding role model" since his release from prison. He said Estes told him what he had done, and his son has forgiven him. He has watched his father get physically and verbally assaulted, but Estes always reminds him that actions have consequences and that people should take responsibility for the things they do. His father remains "gracious and humble" when treated with hostility. He said Estes "blames himself for his misfortune." The three other persons who wrote letters described Estes as remorseful, guilt-ridden, and wanting to be a good family member.

---

[6] He was released from prison after serving time for the sex offenses on February 1, 2006. So, when he says he was released in 2007, obviously he served more time in custody in some facility for some reason, but he does not explain. Perhaps this was the one year, 10 months the Modesto Police Department's "Petition Checklist" listed. In any event, it appears this "timeline" may have been prepared in response to the trial court's request at the initial hearing that the defense explain what Estes has been doing since his "two-year commitment."

9.

## B.     Hearings

At the next hearing, defense counsel requested another continuance.  The trial court granted the continuance and told defense counsel it "wants to see whether or not there has been any sex offender training since the conviction."

The petition was heard on April 2, 2024.  The People maintained the trial court should deny the petition, noting, among other things, the lack of evidence that Estes had completed "some type of sex offender treatment and counseling," his alleged threat to kill M., and the alleged Facebook message.  Defense counsel responded to emphasize that the registration requirement is not intended to be punitive.

The court agreed the requirement is not meant to be punitive.  It then said it had "considered the factors that are set forth in [section 290.5]," and said it was concerned about "the length of time this went on and the accompaniment of threats."  The court then said:  "I don't necessarily think that the factor whether or not the victim was a stranger mitigates towards registration because those that are closest to the defendant know what has happened.  In my opinion that factor protects against a person who victimizes people that are outside of his social contact."  The court continued:  "But nonetheless I would like to see some type of sex offender training.  I don't see any mention of that in his mitigation packet.  Do you know whether or not any of that has been attempted, [defense counsel]?"

After a pause in the proceedings, defense counsel said Estes told her he participated in counseling as required as part of his parole after his sex offense convictions.  The court asked, "Is there any proof of what type of counseling that was, and was it the sex offender management board certified counseling?"  Counsel replied that Estes does not remember since so much time had passed.  The court said:

> "Well, two things he can do.  Today I will deny the request for three years on the factors as I see them.  What I would appreciate having before me the next time is proof of that training, whether he's taken it before if he can get it from his parole officer or if he takes it now.  But it should be sex

10.

offender management, board certified sex offender training. That would assist the court in evaluating his petition on the next go around. Today I will deny the motion for three years."

## DISCUSSION

Estes contends the trial court abused its discretion in denying his section 290.5 petition. We first provide the applicable law and then present and analyze Estes's arguments.

### I. Applicable law

Section 290 et seq. requires a person convicted of certain sex crimes to register as a sex offender. Originally, all sex offenders were subject to a lifetime registration requirement. Effective January 1, 2021, section 290 was restructured to provide for three tiers of registration for sex offenders, based primarily on the offense. (Stats. 2017, ch. 541, § 2.5; see § 290, subd. (d).) Registration requirements can now be for 10 years (tier one), 20 years (tier two), or a lifetime (tier three). (§ 290, subd. (d).) Estes is a tier one sex offender under the revised law, "subject to registration for a minimum of 10 years." (§ 290, subd. (d)(1); see § 290.5, subd. (a)(1).)

Section 290.5 permits tier one and two offenders to petition the trial court to terminate their registration requirement. The prosecution may request a hearing and "present evidence" to demonstrate "community safety would be significantly enhanced by requiring continued registration." (§ 290.5, subd. (a)(2)–(3).) In other words, the prosecution has the burden of producing evidence to establish "terminating the registration requirement considerably raised the threat to society because" a petitioner is "*currently* likely to reoffend." (*People v. Thai* (2023) 90 Cal.App.5th 427, 433 (*Thai*).) Thus, the trial court's task when ruling on a petition "is to assess whether the People have carried their burden[.]" (*People v. Franco* (2024) 99 Cal.App.5th 184, 192.) If no hearing is requested, the court "shall" grant the petition so long as the petitioner is currently registered, has no pending charges that could extend his or her registration

11.

period, and is not in custody or on parole, probation, or supervised release.[7] (§ 290.5, subd. (a)(2).)

In making its decision, the trial court must decide "whether community safety would be significantly enhanced by requiring continued registration." (§ 290.5, subd. (a)(3).) In reaching the decision, the court must consider a number of factors, including the "nature and facts of the registerable offense"; the "age and number of victims"; whether "any victim was a stranger at the time of the offense"; "criminal and relevant noncriminal behavior before and after conviction for the registerable offense"; how long the person has not reoffended; the "successful completion, if any, of a Sex Offender Management Board-certified sex offender treatment program"; and the "person's current risk of sexual or violent reoffense," including whether the defendant received a score for risk levels on a "SARATSO static, dynamic, and violence risk assessment instrument[.]" (*Ibid.*) The court may consider "other evidence submitted by the parties which is reliable, material, and relevant." (*Ibid.*) If the court denies the petition, it must "set the time period," ranging from one to five years, "after which the person can [re-petition] for termination," and provide its reasons. (§ 290.5, subd. (a)(4).)

"An appellate court reviews the trial court's ruling on a petition for termination from the sex offender registry for abuse of discretion. [Citation.] To establish an abuse of discretion, a defendant must demonstrate the trial court's decision fell outside the bounds of reason, i.e., was arbitrary, capricious, or patently absurd. [Citation.] [¶] 'The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review. The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious.'

---

[7] Estes's petition satisfied these requirements, and thus the court would have had to grant it had the People not requested a hearing.

12.

[Citation.] A trial court abuses its discretion when its factual findings are not supported by the evidence, or its decision is based on an incorrect legal standard." (*Thai, supra,* 90 Cal.App.5th at p. 433.)

## II.     Issues and analysis

Estes contends the People failed to meet their burden of showing that community safety would be significantly enhanced by requiring continued registration and thus the trial court abused its discretion by denying his petition. He argues the evidence presented did not show he is currently likely to reoffend. To this point, he asserts his post-sex offense convictions for violating parole and embezzlement were insufficiently proven. He also asserts that these convictions, in any event, do not show a current likelihood to reoffend, as the last of these alleged convictions was over 13 years ago, in 2010. He also notes his sex offense convictions are 20 years old. He also contends that M.'s claim that he threatened to kill her while holding a knife is suspect as she had the opportunity to say that at the preliminary hearing but did not, and instead "came up with it two decades later, when she is so clearly attempting with her letter to extend [his] grief[.]" He adds that the nature and facts of his sex offenses, especially considering they occurred 20 years ago, do not alone demonstrate a risk to the community today.

Estes also contends the trial court abused its discretion by considering the lack of evidence of completion of a sex offender treatment program in a way that impermissibly shifted the burden of proof to him. We agree with him on this point. While section 290.5 permits the court to consider whether Estes has "successfully completed, if any," a certified sex offender treatment program, the statute does not require completion of such a program as a prerequisite. Importantly, it does not shift the burden to the petitioner to affirmatively prove rehabilitation. Instead, the burden remains on the People to establish that continued registration would "significantly enhance" community safety.

The record shows that the court stated it was denying the petition "based on the factors as I see them," and it specifically mentioned concerns about the length of the

13.

conduct and the presence of threats. These words indicate the court considered multiple factors, not solely the lack of proof of completion of a Sex Offender Management Board-certified treatment program. But the court also stated, "I would like to see some type of sex offender training. I don't see any mention of that in his mitigation packet," and, after being told that Estes could not confirm the specific type of counseling he underwent, the court said, "Today I will deny the request for three years…. What I would appreciate having before me the next time is proof of that training." These remarks strongly suggest that the absence of proof of completion of a certified treatment program was a factor that weighed in the court's denial. Additionally, the court's concluding statement that "proof of that training … would assist the court in evaluating [the] petition on the next go around" further reinforced that the court treated the absence of such proof as a deficiency in Estes's showing. This comment suggests the court viewed proof of treatment as not merely relevant, but as a condition that would strengthen, and perhaps be required for, a successful future petition.

Even if this factor were not dispositive or principal among the reasons for denial, its use was still legally improper. The statute allows the court to consider the *presence* of a completed treatment program, but it does not allow the court to treat the *absence* of such evidence, standing alone and without connection to a showing of increased risk, as a mark against the petitioner. In the absence of a showing by the People that Estes's failure to complete or document such treatment increased the danger to community safety, the court's reliance on that absence improperly shifted the burden of proof. This was an abuse of discretion. (*Thai, supra,* 90 Cal.App.5th at p. 433 [applying incorrect legal standard is abuse of discretion].)

The trial court's shifting of the burden of proof as to this factor was not harmless. Under the governing standard, the question is whether there is a reasonable probability the court would have granted Estes's petition absent the error. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) We conclude there is. The record shows Estes met the statutory

criteria to be eligible for relief and submitted letters from himself and others evidencing remorse. The evidence showed he had not committed any new sex offenses, and, if the People's unsupported assertions are to be believed, he has not reoffended at all in over 10 years. While the court cited the nature and facts of the sex offenses and the presence of threats, it appeared to rely heavily on the absence of proof of completion of a certified treatment program. Indeed, it specifically advised Estes to return with such proof in his future petition, and its comments suggested that such proof would, at the very least, strengthen his next petition, if not be required for the court to grant it. Had the court not held against Estes the absence of proof of completion of a certified treatment program without first requiring the People to show how that connects to a current likelihood to reoffend, there is a reasonable probability of a different outcome. We therefore reverse the order denying Estes's petition and remand for a new hearing.

## DISPOSITION

The order denying the petition is reversed and the matter is remanded to the trial court for a rehearing on the petition. Ahead of the rehearing, the parties may submit new evidence, lodge objections to any evidence, and present new arguments.

15.